## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| **TIMOTHY J. DELAURO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:08 CV 232** |
| | ) | |
| **CORRECTIONAL MEDICAL** | ) | |
| **SERVICES, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION and ORDER

Plaintiff Timothy J. Delauro brought suit against defendants Correctional

Medical Services, Inc., the Indiana Department of Correction ("IDOC"), Bill Wilson,

Mary Treadwell, Dr. Oliver Crawford, and Ron Neal, alleging negligence, violations of

the Eighth Amendment to the United States Constitution, and violations of article I, § 16

of the Indiana Constitution, all arising out of a period of incarceration at the Westville

Correctional Facility in Laporte County, Indiana. (DE # 1.) Defendants Crawford and

Correctional Medical Services, Inc. (DE # 43), and defendants IDOC, Wilson, Treadwell,

and Neal (DE # 46), have moved for summary judgment on both of plaintiff's claims.

For the following reasons, those motions are granted in part, and the remaining claim is

remanded to state court.

## I.    PLAINTIFF'S FAILURE TO RESPOND

Defendants Crawford and Correctional Medical Services, Inc. ("CMS") filed their

motion for summary judgment (DE # 43) on February 21, 2012. Defendants IDOC,

Wilson, Treadwell, and Neal filed their motion for summary judgment (DE # 46) on

February 27, 2012. Under this district's local rules, plaintiff had 28 days within which to respond to each of these motions, N.D. IND. LOCAL R. 56.1(b), plus three additional days because both groups of defendants served their motions on plaintiff via the court's electronic filing system, FED. R. CIV. P. 6(d).

The time for plaintiff to file responses to these motions has long passed, and plaintiff has not responded to either motion. Additionally, plaintiff has not filed any motion seeking an extension of time to respond or attempting to explain his failure to respond. Plaintiff has not filed any documents since the two summary judgment motions were filed in February of 2012. Even though plaintiff has not responded, the court applies the same summary judgment standard, outlined below.

## II.   FACTUAL BACKGROUND[1]

At all times relevant to the facts of the case, plaintiff was incarcerated at the Westville Correctional Facility (hereinafter "WCF").

### A. Tuesday April 11, 2006

The first indication that plaintiff gave anyone in the prison that he was having medical issues came on April 11, 2006. On that day, plaintiff submitted a request for health care complaining of bad stomach pain, vomiting, and a headache. (DE # 45-3 at 2.) Plaintiff was examined in the Urgent Care Center by a nurse later that day. (DE # 45-

---

[1] These facts are primarily made up of the facts that each group of defendants submitted in their Statements of Material Facts. (DE # 43 at 2; DE # 47 at 3.) Because plaintiff has not responded to either motion, those facts are deemed admitted for purposes of these motions. FED. R. CIV. P. 56(e)(2).

5 at 19.) Plaintiff reported vomiting, feeling weak, and urinating during the night, which was abnormal for him. (*Id.*) Plaintiff denied any sort of abdominal pain. (*Id.*)

The nurse referred plaintiff to nurse practitioner Barbara Brubaker. (*Id.*) Nurse practitioner Brubaker prescribed Phenergan[2] and Tylenol, and told plaintiff to come back in two days for a check up. (*Id.*; DE # 45-3 at 3.)

**B. Thursday 13, 2006**

On April 13, 2006, plaintiff, as instructed, returned to the Urgent Care Center, and was examined by the same nurse that had examined him two days earlier. (DE # 45-5 at 19.) Plaintiff reported that he still felt weak, was nauseous, was having diarrhea, had vomited three times since his last visit, was urinating every half hour in small amounts, and had pain in his testicles. (*Id.*) A sample of plaintiff's urine was taken, which revealed a small amount of blood. (*Id.* at 20.) Plaintiff was then admitted to the infirmary to see a doctor. (*Id.* at 19.)

Later that day, defendant Dr. Crawford examined plaintiff. (DE # 45-2 at 1.) Up until that point, Dr. Crawford had no knowledge of plaintiff's condition because plaintiff had been treated by NP Brubaker prior to his admittance to the infirmary. (*Id.*) After examining plaintiff, Dr. Crawford ordered an x-ray of plaintiff's pelvic area, the results of which led Dr. Crawford to determine that a CT scan of plaintiff's pelvic area

---

[2] Phenergan ("Promethazine") is a prescription medication that has many uses, including helping control motion sickness or nausea and vomiting that may occur after surgery. *See* www.nih.gov, Promethazine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000637/ (last visited August 17, 2012).

3

was required to rule out appendicitis. (*Id.* at 2.) Dr. Carter submitted a request for an emergency room visit, and made note of plaintiff's history of abdominal pain, low-grade fever, vomiting, and nausea. (*Id.*; DE # 45-3 at 4.)

Plaintiff was then taken to St. Anthony Hospital, where the medical staff performed the CT scan of his pelvic area. (DE # 45-8 at 2; DE # 45-2 at 2.) The CT scan showed no signs of appendicitis. (DE # 45-8 at 2; DE # 45-3 at 6.)

### C. Friday April 14, 2006

The following day, prison officials got an emergency call to plaintiff's cell. (*See* DE # 45-5 at 21.) Plaintiff was on the floor in pain, and complained of vomiting and a tender abdomen. (*Id.*) He also had sluggish bowel sounds. (*Id.*) Plaintiff was examined by NP Brubaker once he got to the infirmary. (DE # 45-3 at 10.) NP Brubaker ordered IV fluids for plaintiff and prescribed plaintiff Phenergan. (DE # 45-3 at 10.) She also ordered plaintiff's vital signs be taken four times a day and restricted plaintiff to an all liquid diet. (*Id.*)

Later that night, plaintiff continued to complain of abdominal pain and began vomiting dark green bile. (DE # 45-5 at 23.) At that point, plaintiff appeared very pale and looked unstable on his feet, although his vital signs were normal. (*Id.*) The nursing staff continued to monitor plaintiff. (*Id.*)

**D. Saturday April 15, 2006**

On the following day, the medical staff at the prison continued to monitor plaintiff, checking on him numerous times throughout the day. (*Id.* at 23-25.) Throughout the morning, plaintiff continued to feel nauseous and was vomiting a dark green, chunky substance. (*Id.* at 23.) The nursing staff removed plaintiff's IV after he asked for it to be removed. (*Id.*) The IV was replaced a short time later. (*Id.*) At 8:30 AM, a nurse noted that plaintiff had regular bowel sounds, specifically noting that plaintiff's bowel sounds were not overactive. (*Id.*) The nurse noted that he or she planned to notify the doctor on call. (*Id.*)

Later that morning, NP Brubaker prescribed plaintiff Phenergan once again, although it appears she was not actually at the facility, but was only contacted because a prior Phenergan order was incomplete. (*Id.* at 24; DE # 45-3 at 11.) Plaintiff fell asleep around 10:30 AM that morning. (DE # 45-5 at 24.) After he woke up, he was no longer nauseous or vomiting, but instead had diarrhea. (*Id.*) Plaintiff initially had abdominal pain in the early afternoon, but later denied having any serious cramping in his abdomen. (*Id.*) Plaintiff got out of bed and walked around several times. (*Id.*)

By late afternoon, plaintiff was complaining of nausea again, but indicated that his nausea was "starting to slow down[,]" and was not vomiting at that point. *Id.* at 25. At 9:00 PM that evening, plaintiff told the nursing staff that he felt "a little better[,]" although he was attempting to make himself vomit. (*Id.* at 25.)

Dr. Crawford was not at the prison on this date. (DE # 45-2 at 2.) He was on call if the nursing staff needed his assistance. (*Id.*)

**E. Sunday April 16, 2006**

The nursing staff checked on plaintiff at 5:00 AM the next morning, noting that plaintiff had slept in short intervals, that his IV was working well, that he was urinating frequently. (DE # 45-5 at 25.) Plaintiff also reported having loose stool. (*Id.*) Later that morning, plaintiff told the nursing staff that he was not feeling well, but he did get out of bed and took a shower. (*Id.*) Plaintiff later denied nausea and had a normal bowel movement. (DE # 45-6 at 1.)

That evening, plaintiff complained of testicular pain and a burning pain in his lower abdomen, but denied nausea at that time. (*Id.*) He described the pain he was experiencing as a five on a scale of one to ten. (*Id.*) Additionally, plaintiff's bowels sounded sluggish. (*Id.*) Plaintiff's temperature at 6:00 PM was 101.6. (*Id.*) Plaintiff told the nursing staff that he felt better at that point than when he was taken to the hospital a few days earlier. (*Id.*) The nurse on duty informed NP Brubaker of plaintiff's current symptoms, and NP Brubaker prescribed plaintiff Tylenol. (*Id.*; DE # 45-3 at 12) Plaintiff's temperature at 8:00 PM that evening was 100.5. (DE # 45-6 at 1.)

Dr. Crawford was not at the prison on this date. (DE # 45-2 at 2.) He was on call if the nursing staff needed his assistance. (*Id.*)

**F. Monday April 17, 2006**

In the early hours of April 17, plaintiff informed the nursing staff that his stomach hurt and that it felt like he had to go to the bathroom all the time. (DE # 45-6 at 2.) Plaintiff got up to go to the bathroom several times during the night. (*Id.*) The nursing staff observed that his stool was still loose. (*Id.*) Plaintiff complained of lower abdominal pain, and that area was tender to the touch. (*Id.*) The nursing staff drew blood for the lab. (*Id.*)

During the early evening of April 17, plaintiff's IV fluids were discontinued. Plaintiff got up and walked around numerous times. (*Id.*) Plaintiff did not complain of any discomfort that evening. (*Id.*)

**G. Tuesday April 18, 2006**

During the morning hours of April 18, plaintiff complained of stomach pain and diarrhea. (*Id.*) Plaintiff's temperature at that point was 100.2. (*Id.*) Plaintiff had frequently gotten up during the night to use the bathroom. Plaintiff's temperature was 100.2 at 6:10 AM, and plaintiff was given Tylenol for his increased temperature. (*Id.*)

Dr. Crawford examined plaintiff at approximately 8:00 AM that morning. (DE # 45-2 at 2; DE # 45-6 at 5.) Plaintiff had nausea, vomiting, fever, diarrhea and abdominal pain. (DE # 45-2 at 2.) Dr. Crawford ordered another IV, Phenergan for seven days, Zantac for seven days, and antibiotics. (*Id.*) Dr. Crawford also wanted to rule out gastritis and appendicitis, so he filled out the appropriate form to send plaintiff

7

to Wishard hospital, noting that plaintiff had a fever, abdominal pain, diarrhea, and that a recent CT scan showed no signs of appendicitis. (*Id.*)

Dr. Crawford examined plaintiff again later that day. (*Id.*) Plaintiff complained of stomach pain and frequent diarrhea. (*Id.*) Dr. Crawford examined plaintiff's stomach and ordered an IV. (*Id.*) Plaintiff was transferred to Wishard Hospital later that day. (*Id.*; DE # 45-6 at 6.)

**H. April 19, 2006[3] - May 3, 2006**

Plaintiff was a patient at Wishard Hospital from April 19, 2006 to May 3, 2006. (DE # 45-2 at 3.) On April 19, 2006, plaintiff underwent surgery for a ruptured appendix with peritonitis.[4] (*Id.*; DE # 45-9 at 2.) Plaintiff's appendix was removed and the peritoneal abscesses were drained. (DE # 45-2 at 3; DE # 45-9 at 2.)

After receiving surgery, plaintiff stayed at the hospital for approximately two weeks, until his discharge on May 3, 2006. (DE # 45-2 at 3; DE # 45-9 at 2.) Plaintiff was given instructions upon his discharge from Wishard. (DE # 45-4 at 5.) The prison staff was instructed to give plaintiff Tylenol as needed, Colace twice a day, and suppositories

---

[3] The evidence shows that although plaintiff was taken to Wishard Hospital on April 18, he was not admitted until the next day, April 19. (DE # 45-2 at 2; DE # 45-9 at 2.)

[4] Peritonitis is "an inflammation of the peritoneum, the tissue that lines the inner wall of the abdomen and covers and supports most of your abdominal organs[,]" and can be caused by a ruptured appendix. *See* WebMD.com, Peritonitis, http://www.webmd.com/digestive-disorders/peritonitis-symptoms-causes-treatments (last visited August 17, 2012).

as needed. (*Id.*) Additionally, plaintiff was to be brought back to the emergency room if his fever reached a temperature higher than 101.5, or if he had "nausea, vomiting, abdominal distention, increasing abdominal pain or any wound drainage . . . ." (*Id.*) The prison staff was also instructed to change plaintiff's wet-to-dry wound dressing twice a day. (*Id.*) Finally, plaintiff was instructed not to lift anything over ten pounds for six weeks. (*Id.*)

**I. May 3, 2006 - June 9, 2006**

After returning to the WCF, NP Brubaker ordered the medications that plaintiff had been instructed to take upon discharge. (DE # 45-4 at 5; *Id.* at 7; *Id.* at 20.) Plaintiff reported to the medical staff that his stomach felt "OK." (DE # 45-6.) Over the next few weeks until plaintiff's discharge on June 9, 2006, Dr. Crawford and the medical staff paid very close attention to plaintiff and his wound. (DE # 45-2 at 3.) Plaintiff remained in the prison's infirmary from May 3 until May 23. (*Id.*) The medical staff cleaned and dressed plaintiff's wound at least three times a day. (*Id.*) The skin surrounding plaintiff's surgical site was monitored very closely. (*Id.*)

During the first week of May, plaintiff developed an infection at his surgery site. (*Id.*) Dr. Crawford treated the infection by prescribing medicine and removing the infected skin, and the infection cleared up quickly. (*Id.*) On May 23, 2006, Dr. Crawford discharged plaintiff from the infirmary after a CT scan at a local hospital came back normal. (*Id.*; DE # 45-8 at 6.) Plaintiff was released from the WCF on June 9, 2006. (DE # 45-2 at 3.)

9

### III.    PLAINTIFF'S CLAIMS

As noted above, plaintiff has brought two claims against defendants. In Count I, plaintiff alleges that defendants were negligent by "fail[ing] to diagnose, treat for and treat plaintiff's appendicitis and ruptured appendix in a properly [sic] and timely manner." (DE # 1.) In Count II, plaintiff alleges violations of the Eighth Amendment to the Constitution and article I, § 16,[5] of the Indiana State Constitution. (*Id.*) Plaintiff alleges that defendants[6] ignored his complaints about extreme abdominal pain, and that those complaints "were made known or should have been made known to or otherwise discovered by the other of the foregoing defendants, but his complaints were ignored and his medical condition was left undiagnosed and untreated for many days." (*Id.*) Specifically, plaintiff alleges that defendants "failed and refused to properly and timely investigate the complaints, failed and refused to properly and timely diagnose plaintiff's medical condition of appendicitis and ruptured appendix, and failed and refused to properly and timely treat the condition[;]" actions he argues amount to deliberate indifference. (*Id.*) Plaintiff also alleges that these practices were part of defendants' official policies, practices, or customs. (*Id.*)

---

[5] That section states, in part: "Cruel and unusual punishments shall not be inflicted." Ind. Const. art. 1, § 16.

[6] Neither NP Brubaker nor any member of the nursing staff are defendants in this case.

10

## IV.    LEGAL STANDARD

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## V.    ANALYSIS

Plaintiff alleges that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and article I, § 16 of the Indiana Constitution. (DE # 1.) Plaintiff also alleges that "[t]hese actions and omissions were part of the official policies, practices, protocols and customs, or were sufficiently pervasive to be construed as the policies, practices, protocols and customs of defendants and IDOC." (*Id.*) The court will begin its analysis with the an overview of the Eighth

12

Amendment deliberate indifference standard, and will then discuss each defendants' liability.

The Eighth Amendment prevents the infliction of "cruel and unusual punishments." U.S. CONST. Amend. VIII. "The Eighth Amendment's prohibition against cruel and unusual punishment, which embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' prohibits punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102 (1976)). "The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Id.* (quoting *Estelle*, 429 U.S. at 103). Prison officials violate the Eighth Amendment if they are "deliberately indifferent to prisoners' serious medical needs." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Thus, for a plaintiff to succeed on a claim for deficient medical care, the plaintiff has the burden of proving two elements: "1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Id.*; *see also Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003).

"A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005)). "A

medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Neither group of defendants argue that plaintiff did not have an objectively serious medical condition (DE ## 43, 47), and the Seventh Circuit has held that an inflamed appendix meets this standard. *Sherrod v. Lingle*, 223 F.3d 605, 610-11 (7th Cir. 2000) (citing *Chavez v. Cady*, 207 F.3d 901, 905 (7th Cir. 2000)). Therefore, the court will continue to the second prong of the deliberate indifference analysis.

"Deliberate indifference is a subjective standard." *Arnett*, 658 F.3d at 751. Under this standard:

> [C]onduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner, *i.e.,* "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'"

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito,* 152 F.3d 564, 577 (7th Cir. 1998)). "Although negligence or inadvertence will not support a deliberate indifference claim, an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate care." *Elyea*, 631 F.3d at 857; *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Negligence—even gross negligence—is insufficient to meet this standard, but the plaintiff is not required to show intentional harm."). "'[I]t is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.'" *Elyea*, 631 F.3d at 857

(quoting *Greeno,* 414 F.3d at 653); *see also Greeno,* 414 F.3d at 653 ("*The officials must know of* and disregard an excessive risk to inmate health . . . ."(emphasis added)); *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("[A] plaintiff claiming an Eighth Amendment violation must show the defendant's actual knowledge of the threat to the plaintiff's health or safety . . . .").

Plaintiff's complaint does not make clear whether plaintiff is suing defendants Dr. Crawford, Wilson, Treadwell, and Neal in their individual capacities or their official capacities, or both. The court will assume for the sake of argument that plaintiff's complaint alleges claims against these defendants in both their individual and official capacities.

**A. Dr. Crawford**

**1. Individual Capacity**

Plaintiff alleges that Dr. Crawford (and the other defendants) "intentionally or recklessly, wilfully and wantonly ignored plaintiff's complaints, failed and refused to properly and timely investigate the complaints, failed and refused to properly and timely diagnose plaintiff's medical condition of appendicitis and ruptured appendix, and failed and refused to properly and timely treat the condition." (DE # 1.) Dr. Crawford argues that he is entitled to summary judgment because no reasonable jury could conclude that he was deliberately indifferent to plaintiff's medical needs. (DE # 44 at 16.)

15

Under Seventh Circuit precedent, a failure to properly diagnose and treat an objectively serious medical condition can constitute deliberate indifference. For example, in *Lingle*, the plaintiff, an inmate, complained of increasing pain in his lower right abdomen over the course of a week. 223 F.3d at 608. Although the plaintiff was seen by the prison nursing staff on almost a daily basis, and although the nursing staff noted the possibility that the plaintiff had appendicitis, the plaintiff was not sent to the hospital or examined by a doctor until eight days after he first complained of this pain. *Id.* at 608-09. The plaintiff was eventually sent to a hospital and examined by an emergency room doctor, who prescribed pain medication and ordered the plaintiff to come back three days later for more tests. *Id.* at 609. The next day, back at the prison, the plaintiff's pain was so severe that he could not stand up, but the nursing staff did not contact a prison doctor until two days later, the day the plaintiff was scheduled to return to the hospital for more tests. *Id.* Despite the hospital doctor's orders for the plaintiff to come back for more testing, however, the prison doctor refused to send the plaintiff to a hospital and did not even examine the plaintiff. *Id.* The plaintiff was examined by a prison doctor the following day. *Id.* That doctor ordered an abdominal x-ray, but did not review the x-ray or order the plaintiff to the hospital. *Id.* The plaintiff was taken to the hospital twice over the following two days. *Id.* After tests revealed there was nothing wrong with him, he asked to be taken to a different hospital, but a prison doctor denied the request. On the following day, the plaintiff was taken to an emergency room where emergency surgery was performed for a ruptured appendix. *Id.*

The plaintiff in *Lingle* brought a deliberate indifference claim against the prison medical staff. *Id.* The district court granted summary judgment to the defendant after finding that the plaintiff could not show that the prison medical staff had been deliberately indifferent to the plaintiff's medical needs. *Id.* at 610. The Seventh Circuit reversed the district court, concluding that the evidence, when viewed in the light most favorable to the plaintiff, raised questions of material fact as to whether the prison staff was deliberately indifferent to the plaintiff's medical needs. *Id.* at 611. The Seventh Circuit noted that the evidence showed that the plaintiff may not have been examined by a doctor until several days after his initial complaints. *Id.* Additionally, despite noting the possibility of appendicitis, the staff did not perform the tests necessary to rule out that affliction. *Id.*

In *Lor v. Kelley*, another case where an inmate alleged that a prison doctor showed deliberate indifference, the Seventh Circuit reached the opposite conclusion. 436 F. App'x 634 (7th Cir. 2011). In that case, the plaintiff submitted a request to the prison doctor complaining of lower abdominal pain, pain in his testicles, and pain in his rectum. *Id.* at 635. The prison doctor examined the plaintiff the next day, and found that the plaintiff had a "soft" abdomen, but had no other signs of inflammation. *Id.* The doctor also scheduled an appointment for the plaintiff to get a visual examination of the anal canal a month later. *Id.* Three days later, the plaintiff submitted another medical request and noted that the pain he was experiencing had significantly worsened. *Id.* A nurse responded to that request by telling the plaintiff that he could see a doctor one

17

month later. *Id.* The following day, the plaintiff experienced "excruciating pain" in his lower abdomen, and was sent to the hospital by a nurse. *Id.* A doctor at the hospital diagnosed the plaintiff with a urinary tract infection and prostatitis (inflamation of the prostate gland), and prescribed antibiotics and pain killers. *Id.* Three days later, in a follow-up examination, the prison doctor determined that there was no swelling or enlargement of the plaintiff's prostate, and a test of the plaintiff's urine came back normal. *Id.*

Over the next two months, the plaintiff continued to complain of genital and rectal pain, and the prison doctor had two more follow-up appointments with the plaintiff. *Id.* At the first appointment, the prison doctor administered a prostate-specific test and prescribed another week of the antibiotic the plaintiff was currently on. *Id.* The prison doctor also determined that the symptoms the plaintiff was experiencing were less severe than before. *Id.* At the second appointment, the plaintiff complained of increased pain in the urinary tract, and the prison doctor prescribed a different antibiotic. *Id.* After plaintiff's prostatitis symptoms continued into a third month, the prison doctor performed another prostate exam, ordered various lab tests, and also ordered an ultrasound of the plaintiff's bladder and kidneys. *Id.* at 635-36. Those tests all came back normal. A few weeks later, the prison doctor examined the plaintiff again, and, after observing that the plaintiff was still having issues, submitted a request for the plaintiff to see an outside specialist. *Id.* at 636. That request was denied by the prison's Medical Review Committee, which instead recommended that the plaintiff start taking

18

a different antibiotic. *Id.* The prison doctor followed that recommendation and prescribed the antibiotic the next day. *Id.*

The plaintiff eventually filed suit against several defendants, including the prison doctor, claiming deliberate indifference. *Id.* The plaintiff argued in part that the prison doctor was deliberately indifferent by not granting the plaintiff's requests to see an outside specialist. *Id.* The district court granted the prison doctor's motion for summary judgment, finding that no reasonable jury could conclude that the prison doctor had acted with deliberate indifference. *Id.* The plaintiff appealed, and the Seventh Circuit affirmed the district court's decision. *Id.* at 637-38. In reaching that conclusion, the Seventh Circuit noted that the prison doctor had "prescribed and adjusted [the plaintiff's] antibiotics . . . performed relevant examinations and laboratory tests  . . . and sought outside advice about a specialist referral from the Medical Review Committee." *Id.* at 637. Additionally, the court noted that the prison doctor had followed the antibiotic treatment plan that "conformed to the plan outlined on the National Institutes of Health webpage . . . ." *Id.*

In this case, Dr. Crawford was called in to examine plaintiff on two different days: April 13, 2006 and April 18, 2006.[7] On both of those days, Dr. Crawford sent plaintiff to a local hospital to get a CT scan to rule out appendicitis. As noted earlier,

---

[7] On Saturday April 15, 2006, there is a note in plaintiff's chart that indicates one of the nurses planned to call Dr. Crawford. (DE # 45-5 at 24.) There is no indication that the nurse ever called Dr. Crawford. Even if he or she had called Dr. Crawford, the note came after an update that showed plaintiff had regular, non-overactive, bowel sounds. (*Id.*)

plaintiff was eventually treated for a ruptured appendix. Thus, on both occasions, Dr. Crawford sent plaintiff to the hospital to be examined for the precise affliction that eventually required plaintiff to have emergency surgery.

Additionally, in this case, like in *Lor*, and unlike in *Lingle*, Dr. Crawford promptly examined plaintiff on both occasions after the nursing staff referred the plaintiff to him. Moreover, there is no evidence that the nursing staff contacted Dr. Crawford[8] to request assistance in treating plaintiff other than on the two dates that Dr. Crawford actually examined plaintiff.[9] Finally, unlike the prison medical staff in *Lingle*, when plaintiff showed signs of appendicitis, Dr. Crawford sent plaintiff to the hospital to specifically rule out appendicitis. *Lingle*, 223 F.3d at 611.

Given the evidence presented in this case, no reasonable jury could conclude that Dr. Crawford was deliberately indifferent to plaintiff's medical condition.[10] Thus,

---

[8] The only time that the nursing staff appears to have contacted anyone with an update outlining plaintiff's worsening condition was on Sunday April 16, in the evening, when the nursing staff contacted NP Brubaker. (DE # 45-6 at 1; DE # 45-3 at 12.)

[9] As mentioned earlier, Dr. Crawford is the only member of the prison medical staff named as a defendant in this case.

[10] As noted above, neither negligence nor gross negligence is sufficient to meet the deliberate indifference standard. *Kramer*, 680 F.3d at 1018. Because Dr. Crawford has submitted the opinion of a medical review panel (DE # 45-12) and an opinion of another medical doctor (DE # 45-11) that both conclude that Dr. Crawford met the applicable standard of care in this case, both of which are unrebutted, plaintiff will likely have a difficult time even succeeding on a state law medical negligence claim against Dr. Crawford. *McGee v. Bonaventura*, 605 N.E.2d 792, 794 (Ind. Ct. App. 1993) ("[Plaintiff] cannot prevail in a medical malpractice action or any other tort claim where the undisputed evidence demonstrates that the defendant did not breach any duty owed to

defendant Crawford has met his initial burden on summary judgment. Plaintiff has not responded to this motion for summary judgment, and has not put forth any evidence upon which a reasonable jury could conclude that Dr. Crawford was deliberately indifferent in this case. Therefore, defendant Dr. Crawford's motion for summary judgment on plaintiff's Eighth Amendment deliberate indifference claim is **GRANTED**.[11]

---

the plaintiff."); *Simms v. Schweikher*, 651 N.E.2d 348, 350 (Ind. Ct. App. 1995) ("If medical expert opinion is not in conflict regarding whether the physician's conduct met the requisite standard of care, there are no genuine triable issues."); *see also Boston v. GYN, Ltd.*, 785 N.E.2d 1187, 1191-92 (Ind. Ct. App. 2003) (summary judgment was appropriate once defendants submitted unanimous panel opinion that doctor did not breach applicable standard of care and plaintiffs failed to "submit expert testimony to establish the applicable standard of care and how that standard was breached.").

[11] Indiana courts appear to apply the same deliberate indifference standard under the state constitution as the Eighth Amendment deliberate indifference standard discussed above. *Compare Plymouth Ambulance Serv.*, 577 F.3d at 828-29 ("The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.' Accordingly, 'deliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.'" (quoting *Estelle*, 429 U.S. at 103-04)), *with Naked City, Inc. v. State*, 460 N.E.2d 151, 161 (Ind. Ct. App. 1984) ("'Deliberate indifference' in this constitutional sense may thus be found where reasonable care is denied or unreasonably delayed with the knowledge that such denial/delay will cause the unnecessary infliction of pain and suffering which serves no penological purpose and when the care is intentionally or wantonly withheld."). Because plaintiff's claim fails under either standard, defendant Dr. Crawford's motion for summary judgment is granted on both plaintiff's deliberate indifference claim under the Eighth Amendment and plaintiff's deliberate indifference claim under article I, § 16 of the Indiana Constitution.

### 2. Official Capacity

A Section 1983 claim against an employee of a private corporation in his or her official capacity is treated as a claim against the corporation itself. *Galloway v. Swanson*, No. 5:09CV02834, 2012 WL 646074, at *8 (N.D. Ohio Feb. 28, 2012) ("An official capacity claim against an employee of a private corporation is viewed as a claim against the corporate entity itself."); *see also Calhoun v. Miles*, No. 4:06-CV-178-Y, 2006 WL 2423416, at *2 (N.D. Tex. Aug. 22, 2006) (same). Thus, to the extent that plaintiff's claim extends to Dr. Crawford in his official capacity, that claim will be analyzed below in the section of the opinion that analyzes defendant CMS's liability.

### B. Bill Wilson, Mary Treadwell & Ron Neal

### 1. Official Capacity

To the extent that plaintiff is alleging liability against this group of defendants, all state officials, in their official capacities, defendants' motion for summary judgment will be granted. "State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983." *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 69 n. 24 (1997); *see also Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719, 721 (7th Cir. 2009); *Franklin v. Zaruba*, 150 F.3d 682, 684 n.3 (7th Cir. 1998) ("[N]either states nor state officials acting in their official capacities are 'person'" for purposes of § 1983."). Because plaintiff is seeking damages from defendants Wilson, Treadwell, and Neal, plaintiff cannot bring suit against them in their official capacities under Section 1983.

### 2. Individual Capacity

State officials, however, are "persons" for purposes of Section 1983 when sued in their individual capacities, and thus, plaintiff can sue defendants Wilson, Treadwell, and Neal in their individual capacities. *Ill. Dunesland Pres. Soc'y*, 584 F.3d at 721. Defendants Wilson, Treadwell, and Neal argue that they cannot be held liable for deliberate indifference because they had absolutely no knowledge of plaintiff's health condition. (DE #  47 at 7.)

Bill Wilson was the Superintendent of the Westville Correctional facility during the relevant periods of plaintiff's incarceration at that facility. (DE # 47 at 3; DE # 46-1 at 1.) Ronnie Neal was the Assistant Superintendent of Administration at the WCF, although he was not employed at the WCF during the period of time in which plaintiff's medical issues took place. (DE # 47 at 3; DE # 46-3 at 3.) Mary Treadwell was the Assistant Superintendent of Operations at the WCF, although she began her employment there in January 2007, approximately seven months after plaintiff was released from prison. (DE # 47 at 3; DE # 46-2 at 2.)

As noted above, a defendant must have knowledge of the risk of harm that a plaintiff faces to be deliberately indifferent to that risk. *Walker*, 293 F.3d at 1037 ("[A] plaintiff claiming an Eighth Amendment violation must show the defendant's actual knowledge of the threat to the plaintiff's health or safety . . . .") Wilson, Treadwell, and Neal all argue that they cannot be held liable under the Eighth Amendment because

23

none of them had any knowledge of plaintiff's health condition. (DE # 47 at 7; DE 46-1 at 3; DE # 46-3 at 3; DE # 46-2 at 2)

Because knowledge of the threat to plaintiff's health is required for any of these defendants to be liable under the Eighth Amendment, and because all three defendants have presented evidence that shows they did not have knowledge of this incident, these defendants have met their initial burden on summary judgment. Plaintiff has not presented any evidence that these defendants had knowledge of this incident. Therefore, defendants Wilson, Treadwell, and Neal's motion for summary judgment (DE # 46) is **GRANTED**[12] as to plaintiff's individual capacity deliberate indifference claim.[13]

### C. Correctional Medical Services Inc.

#### 1. Respondeat Superior

Plaintiff's deliberate indifference claim as it relates to Correctional Medical Services Inc. is that CMS, "acting through defendant Crawford and its other agents . . . acted under color of state law in causing the deprivation of plaintiff's civil rights, and are accordingly subject to liability under 42 USC [§] 1983." (*See* DE # 1 at 4.) Thus, plaintiff's theory here is essentially one of respondeat superior.

---

[12] Because defendants' motion for summary judgment on Count II is being granted, the court will not reach their qualified immunity argument. (DE # 47 at 8.)

[13] This group of defendant's motion for summary judgment is granted as to plaintiff's deliberate indifference claim under the Eighth Amendment and plaintiff's deliberate indifference claim under article I, § 16 of the Indiana Constitution. *Naked City, Inc.*, 460 N.E.2d at 161; *see supra* note 11.

24

Defendants argue that a corporation like CMS cannot be held vicariously liable under Section 1983 by a theory of respondeat superior. (DE # 44 at 14.) The Seventh Circuit has made clear that "there is no respondeat superior liability" under Section 1983. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *see also Plymouth Ambulance Serv.*, 577 F.3d at 822; *Johnson v. Dossey*, 515 F.3d 778, 782 (7th Cir. 2008). Therefore, to the extent that plaintiff alleges defendant CMS is liable for the actions of its employees, defendants' motion is **GRANTED**. (DE # 43; DE # 44 at 14.)

### 2. Policy Or Practice

Plaintiff also alleges that CMS is liable because the actions or omissions that led to his injury were caused by "official policies, practices, protocols and customs, or were sufficiently pervasive to be construed as the policies, practices, protocols and customs of defendants and IDOC." (*See* DE # 1.) Although, as noted above, a private corporation cannot be held vicariously liable under Section 1983 for the acts of its employees, "a private corporation can be liable if the injury alleged is the result of a policy or practice . . . ." *Dossey*, 515 F.3d at 782.

In *Rice ex rel. Rice v. Correctional Medical Services*, the Seventh Circuit outlined how a private corporation can be liable under Section 1983:

> Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices. In order to recover against a municipal or corporate defendant under section 1983, it is not enough for the plaintiff to show that an employee of the municipality or corporation violated his constitutional rights; he must show that his injury was the result of the municipality's or corporation's official policy or custom. "[M]unicipal liability under § 1983 attaches where—and only where—a

deliberate choice to follow a course of action is made from among various alternatives" by municipal policymakers. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S. Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (quoting *Pembaur,* 475 U.S. at 483–84, 106 S. Ct. at 1300–01) (plurality). An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation. The plaintiff must also show a direct causal connection between the policy or practice and his injury, in other words that the policy or custom was the "'moving force [behind] the constitutional violation.'" *Harris,* 489 U.S. at 389, 109 S. Ct. at 1205 (quoting *Monell,* 436 U.S. at 694, 98 S. Ct. at 2038, and *Polk County v. Dodson, supra,* 454 U.S. at 326, 102 S. Ct. at 454).

675 F.3d 650, 675 (7th Cir. 2012) (some citations omitted).

Plaintiff appears to argue that CMS had an express policy that caused his injury. The express policy theory applies when a plaintiff can point to an explicit policy or an omission in a policy that explicitly violates a constitutional right. *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005). Defendant CMS argues that there is no evidence that would support a finding that CMS had a policy that caused plaintiff's injury. (*See* DE # 44 at 15.) Thus, CMS has met its initial burden on summary judgment. Plaintiff has not directed the court to any evidence that CMS had an express policy or an omission in a policy that explicitly violates any constitutional rights. Plaintiff has therefore failed to create a genuine issue of material fact regarding the existence of an express policy or an omission in a policy that caused his injury, and cannot rest his official capacity claim against the CMS on this theory.

Plaintiff also appears to contend that his injury was caused by a widespread practice or custom. The widespread practice theory applies when a corporation has "a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy . . . ." *Rice ex rel. Rice*, 675 F.3d at 675. CMS argues that there is no evidence that would support a finding that CMS had a widespread practice or custom of failing to provide adequate medical services to inmates, and thus, there is no evidence that CMS had a widespread practice or custom that led to plaintiff's injury. (*See* DE # 44 at 15.) Therefore, CMS has met its initial burden on this issue. Plaintiff has provided no evidence of CMS refusing to provide medical care to other inmates. In fact, plaintiff does not even allege that this happened to him more than once or that other inmates were affected by this practice. Plaintiff therefore argues that one alleged incident of CMS providing inadequate medical care to an inmate is evidence of a widespread practice of CMS providing inadequate medical care to inmates.

While it is not impossible for a plaintiff to show the existence of a practice or custom based on his own experience, it is significantly more difficult. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). In this case, the evidence of one alleged incident is insufficient to create an issue of material fact as to whether this alleged practice was widespread. *See, e.g., id.* at 774-75 (four incidents of plaintiff being given medication bottle all in one lot not sufficient to create an issue of material fact); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759-60 (7th Cir. 2005) (three incidents of improper use of pepper spray not sufficient to constitute a widespread practice); *Palmer*

27

*v. Marion Cnty.*, 327 F.3d 588, 595-96 (7th Cir. 2003) (two incidents of observing inmate-on-inmate violence where guards failed to intervene not sufficient to constitute widespread practice). In short, plaintiff has failed to create a genuine issue of material fact regarding the existence of a widespread practice, and cannot rest his policy or practice claim against CMS on this theory.

The final way that plaintiff could establish that CMS had an official policy or practice of not providing adequate medical care to inmates is by showing that his injury was caused by a person with final policymaking authority for CMS. *Rice ex rel. Rice,* 675 F.3d at 675; *see also Phelan v. Cook Cnty.*, 463 F.3d 773, 789 (7th Cir. 2006). Plaintiff, however, does not argue that someone at CMS with final policymaking authority caused his injury. Therefore, defendants' motion for summary judgment as to plaintiff's policy or practice claim is **GRANTED**.

### D. IDOC

#### 1. Respondeat Superior

To the extent that plaintiff is alleging that IDOC is vicariously liable for the acts of its employees, IDOC's motion for summary judgment is **GRANTED** because "there is no respondeat superior liability" under Section 1983. *Lawson*, 312 F.3d at 875.

#### 2. Policy or Practice

Plaintiff contends that his injury was caused by one of IDOC's policies or practices.(DE # 1.) Defendant IDOC argues that state agencies cannot be sued under Section 1983. (DE # 47 at 6-7.) IDOC is correct; state agencies are considered to be the state under Section 1983, and are therefore not "persons" that can be sued. *Ill. Dunesland*

*Pres. Soc'y,* 584 F.3d at 721 ("[State] agency was properly dismissed because states are not 'persons' within the meaning of section 1983 and so cannot be sued under that section."); *see also Weston v. Ill. Dept. of Human Servs.*, 433 F. App'x 480, 482 (7th Cir. 2011) ("As a state agency, [The Illinois Department of Human Services] is not a 'person' amenable to a § 1983 suit . . . ."); *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007) ("State agencies are not 'persons' under § 1983 . . . .").

## VI.   REMAINING CLAIMS

Because both groups of defendants have been granted summary judgment on Count II of plaintiff's complaint, the only claim that remains is Count I, a state law negligence claim. This action was removed pursuant to 28 U.S.C. § 1331, the federal question jurisdiction statute. (DE # 2.) The court has supplemental jurisdiction over Count I under 28 U.S.C. § 1367. Defendants, however, have now been granted summary judgment on the federal claim.

28 U.S.C. § 1367(c) states:

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

> **(1)** the claim raises a novel or complex issue of State law,
>
> **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> **(3)** the district court has dismissed all claims over which it has original jurisdiction, or
>
> **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Thus, under 28 U.S.C. § 1367(c)(3), when, as here, the federal claim has dropped out of the lawsuit, a "district judge has discretion to relinquish supplemental jurisdiction and remand . . ." *Whitely v. Moravec*, 635 F.3d 308, 311 (7th Cir. 2011).

The Seventh Circuit has identified three situations where a district court should retain jurisdiction over a supplemental claim even though all federal claims have dropped out: "where the statute of limitations would bar the refiling of the supplemental claims in state court…; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007). This suit was originally filed in state court, and was removed, so the statute of limitations is not an issue. Additionally, the court has not spent substantial resources on the resolution of the supplemental claim. Finally, it is not obvious how that claim should be decided.[14]

Therefore, under 28 U.S.C. § 1367(c)(3), the court declines to continue to exercise jurisdiction over plaintiff's state law negligence claim.

---

[14] For example, the court questions, as defendant CMS contends (DE # 44 at 1l), whether Dr. Crawford's affidavit stating that the prison nursing staff met the applicable standard of care, is, by itself, sufficient to satisfy defendant CMS's initial burden on summary judgment. *See Schweikher*, 651 N.E.2d at 351 (Barteau, J., dissenting).

## VII.   CONCLUSION

For the foregoing reasons:

1. The portion of defendant CMS and defendant Dr. Oliver Crawford's motion for summary judgment (DE # 43) that deals with Count II, plaintiff's deliberate indifference claim, is **GRANTED**.

2. The portion of defendant Indiana Department of Correction, defendant Bill Wilson, defendant Mary Treadwell, and defendant Ron Neal's motion for summary judgment (DE # 46) that deals with Count II, plaintiff's deliberate indifference claim, is **GRANTED**.

3. Plaintiff's remaining claim, Count I, a state law negligence claim, is **REMANDED** back to state court. The clerk is directed to return the case to the state court from which it originated.

**SO ORDERED.**

Date: August 28, 2012

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT